ORIGINAL

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

THE NORTH FACE APPAREL CORP., a
Delaware corporation; PRL USA
HOLDINGS, INC., a Delaware
corporation; and POLO RALPH LAUREN
CORPORATION, a Delaware corporation,

        Plaintiffs,

v.

TC FASHIONS, Inc., d/b/a SDT USA
d/b/a EB Garments, a New York
corporation; SDT USA, Inc., a New York
corporation; JOHN DOES 1-15 and XYZ
CORPS. 1-15,

        Defendants.

CIV. ACTION NO.:

**05 CV 9083**

**Judge Berman**

**[FILED UNDER SEAL**
**PURSUANT TO 15 U.S.C. § 1116]**

DEC 2 7 2005

25



---

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' *EX PARTE* APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER, SEIZURE ORDER,**
**ASSET RESTRAINING ORDER, EXPEDITED DISCOVERY ORDER,**
**AND ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION**

## I.  INTRODUCTION

Defendants TC FASHIONS, Inc., d/b/a SDT USA d/b/a EB Garments ("TC") and
SDT USA, Inc. ("SDT) (TC and SDT are collectively referred to as "Defendants") have,
without authorization or consent, misappropriated Plaintiffs The North Face Apparel
Corp. and PRL USA Holdings, Inc. and Polo Ralph Lauren Corporation's (collectively
"PRL USA") (The North Face Apparel Corp. and PRL USA are collectively referred to
as "Plaintiffs") world famous trademarks for use in connection with their counterfeiting
business.  Specifically, Defendants offer for sale, sell and ship jackets and shirts
employing Plaintiffs' trademarks.  Defendants knowingly traffic in these counterfeit
products in reckless disregard of trademark laws and Plaintiffs' trademark rights.

Defendants' willful and intentional infringement of Plaintiffs' trademarks has and continues to irreparably harm Plaintiffs' trademarks, Plaintiffs' reputation and goodwill and Plaintiffs' rightful market position.  In view of the foregoing, Plaintiffs respectfully request that this Court issue (i) a temporary restraining order against Defendants enjoining their manufacture, importation, exportation, distribution, offer for sale and sale of counterfeit products bearing Plaintiffs' trademarks; (ii) a seizure order; (iii) an asset restraining order; (iv) an order for expedited discovery allowing Plaintiffs to inspect and copy Defendants' books and records relating to the manufacture, exportation, distribution, offer of sale and sale of counterfeit products bearing Plaintiffs' trademarks; and (v) an order to show cause why a preliminary injunction should not issue.

## II.    FACTUAL BACKGROUND

### A.    The World Famous The North Face Trademarks and Products

The North Face Apparel Corp., through its licensees and predecessors-in-interest (collectively "TAC") is a leader in the design, marketing and distribution of premium, high-quality technical and casual outdoor apparel and equipment products.[1]  For nearly forty years, TAC's reputation and distinctive image have been consistently developed across an expanding number of products, as well as both domestic and international markets (the "TAC Products").[2]  TAC's trademarks, including all of the marks referenced in the Complaint filed herewith (the "TAC Marks"), are famous and widely-recognized brands.[3]  TAC has carefully built its reputation by, among other things, adhering to quality control standards and its commitment to customer service.[4]  As such, the TAC Products are manufactured pursuant to specific guidelines.[5]  In addition, TAC spends millions of dollars annually to advertise and promote the TAC Products and TAC Marks.[6]

---

[1] *See* Declaration of Barbara Kaplan dated October 24, 2005 ("Kaplan Decl."), ¶ 2.
[2]    *Id.*
[3]    *Id.*
[4]    *Id.*
[5]    *Id.*
[6]    *Id.*

As a result of TAC's extensive marketing and promotional efforts, as well as the high quality of the TAC Products, the TAC Products have achieved an outstanding reputation among consumers.[7]  Concurrently, the TAC Marks have become well and favorably known in the industry and to the public as the exclusive source of the TAC Products, and have come to symbolize the goodwill of TAC Products.[8]  TAC's marketing efforts, combined with its attention to quality and construction, have resulted in billions of dollars in sales of the TAC Products.[9]

### B.    PRL USA's World Famous Trademarks and Products

PRL USA, through its affiliated PRL companies, is a leader in the design, marketing and distribution of premium lifestyle products in apparel, home, accessories and fragrances.[10]  For more than thirty years, PRL USA's reputation and distinctive image have been consistently developed across an expanding number of products, as well as both domestic and international markets (the "PRL USA Products").[11]  PRL USA's trademarks, including all of the marks referenced in PRL USA's Complaint filed herewith (the "PRL USA Marks"), are among the world's most famous and widely-recognized brands.[12]  PRL USA has carefully built its reputation by, among other things, adhering to strict quality control standards and its commitment to customer service.[13]  As such, the PRL USA Products are manufactured pursuant to specific, stringent guidelines.[14]  In addition, PRL USA spends millions of dollars annually to advertise and promote the PRL USA Products and PRL USA Marks.[15]

As a result of PRL USA's extensive marketing and promotional efforts, as well as the high quality of the PRL USA Products, the PRL USA Products have achieved an outstanding reputation among consumers.[16]  The PRL USA Marks have become well and

---

[7]  *Id.*, ¶ 3.
[8]  *Id.*
[9]  *Id.*
[10] *See* Declaration of Sherry L. Jetter dated October 19, 2005 ("Jetter Decl."), ¶ 2.
[11] *Id.*
[12] *Id.*
[13] *Id.*, ¶ 3.
[14] *Id.*
[15] *Id.*
[16] *Id.*, ¶ 4.

favorably known in the industry and to the public as the exclusive source of the PRL USA Products, and have come to symbolize the goodwill of PRL USA Products.[17]  PRL USA's marketing efforts, combined with its attention to quality and construction, have resulted in billions of dollars in sales of the PRL USA Products.[18]

The TAC Products and PRL USA Products are collectively referred to as "Plaintiffs' Products."  The TAC Marks and PRL USA Marks are collectively referred to as "Plaintiffs' Marks."

### C.    Defendants' Sale of Counterfeits of Plaintiffs' Products

Defendants are selling counterfeits of Plaintiffs' Products, including at least down and fleece jackets (the "Counterfeit TAC Products") and knit, button-down and polo shirts (the Counterfeit PRL USA Products") (the Counterfeit TAC Products and Counterfeit PRL USA Products are collectively referred to as the "Counterfeit Products").

### 1.    Defendants' Sale of Counterfeit TAC Products

In September 2005, TAC learned that a company entitled Worldwide Distributors was distributing Counterfeit TAC Products.[19]  TAC contacted Worldwide Distributors, which provided invoices and spreadsheets identifying the source of the Counterfeit TAC Products.[20]  Those documents show that TC sold at least 480 Counterfeit TAC Products to 9 retailers in Washington, Arkansas and Colorado at a total price of $9,600.[21]  The documents further confirm that SDT sold 1152 Counterfeit TAC Products (fleece jackets) to 24 retailers in Utah, Montana, Oregon, Missouri, Kansas, Idaho, Vermont, Washington, Michigan, Colorado, Montana, Nebraska, Iowa, Illinois, Arkansas and California at a total price of $27,284.42.[22]  SDT also sold an additional 204 Counterfeit

---

[17]    *Id.*
[18]    *Id.*
[19]  *See* Declaration of G. Roxanne Elings dated October 24, 2005 ("Elings Decl."), ¶ 2.
[20] *Id.*
[21] *Id.*, Ex. A.
[22] *Id.*, Ex. B.

TAC Products (down jackets) to 12 retailers in Utah, Nebraska, Kansas, Illinois, Wyoming, Colorado, Washington, Montana and Arkansas at a total price of $13,572.42.[23]

TAC has inspected samples of Defendants' Counterfeit TAC Products, and confirmed that such Products are inferior reproductions of the TAC Products, complete with labels and hangtags bearing counterfeits of the TAC Marks.[24]  Among other identifiers, the Products are counterfeit because:

> a. There are security authentication labels are affixed to genuine TAC Products.  The samples have no security authentication label.
>
> b. The primary THE NORTH FACE and design trademark label in the center of the back of the samples does not meet company specifications.  It appears to be a reproduction label commonly observed on counterfeit garments mimicking the McMurdo style jacket.
>
> c. The content, country-of-origin, care, down lot, and tracking labels sewn into the samples do not meet required specifications, and contain erroneous production lot tracking information and conflicting country of origin statement.
>
> d. The workmanship and general quality of assembly of the samples is poor and does not match the specifications or quality standards for genuine TAC Products.[25]

TAC did not manufacture, inspect or package the Counterfeit TAC Products, and did not approve the Counterfeit TAC Products for sale and/or distribution.[26]  TAC did not authorize Defendants to manufacture, import, export, distribute, advertise, sell or offer to sell the Counterfeit TAC Products.[27]  TAC has not had the opportunity to control the quality and nature of the Counterfeit TAC Products.[28]

Separately, TAC has encountered SDT as a distributor of Counterfeit TAC Products in another case, styled *The North Face Apparel Corp. v. Steve Niman et al.*,

---

[23] *Id.*, Ex. C.

[24] *See* Elings Decl., Ex. F.

[25] *Id.*

[26] *See* Kaplan Decl., ¶ 4.

[27] *Id.*

[28] *Id.*

Case No. CV 05-3628 DSF (PLAx) filed in the Central District of California.[29] In that case, over 28,000 Counterfeit TAC Products originating with Defendants Michael Chu, T. Glenn International and Bestvalue International (collectively "Chu Defendants") have been seized.[30] The Counterfeit TAC Products sold by Chu Defendants all bear a label which mistakenly states "Made in China/Fabrique au Bangladesh,"[31] a mistake which Chu Defendants asked their Chinese manufacturer to correct shortly before the California court enjoined Chu Defendants' activities in July 2005.[32] The Counterfeit TAC Products sold by SDT through Worldwide Distributors that form the basis of this action also state "Made in China/Fabrique au Bangladesh,"[33] and Chu Defendants' bank records show that SDT paid Chu Defendants $61,836.18 on March 25, 2005, and $36,864.00 on May 18, 2005, and that Chu Defendants paid SDT $41,496.00 on April 7, 2005.[34]

### 2.    Defendants' Sale of Counterfeit PRL USA Products

In March 2005, PRL USA first learned that TC was selling Counterfeit PRL USA Products. PRL USA contacted TC through an investigator, and learned that TC was offering more than eight thousand pieces of Counterfeit PRL USA Products.[35] Before PRL USA could purchase samples of these Products to confirm their counterfeit nature, TC informed PRL USA that it had sold the balance of this stock.[36] In April 2005, PRL USA's investigator and TC again discussed a potential purchase of Counterfeit PRL USA Products, at which time TC informed PRL that it had twelve thousand pieces available.[37] TC requested extensive information from PRL USA's investigator's pretext business, repeatedly explaining that TC was "very careful" in accepting new business relationships in connection with the sale of branded goods.[38] TC's agent made multiple references to the sensitivity involved in selling branded goods.[39] For reasons unknown, TC then

---

[29] *See* Elings Decl., ¶ 6.
[30] *Id.*
[31] *Id.*, ¶ 7.
[32] *Id.* Ex. D.
[33] *Id.*, ¶ 9.
[34] *Id.*, Ex. E.
[35] *See* Declaration of Tamara D. Olsson dated October 20, 2005 ("Olsson Decl."), ¶ 2.
[36] *Id.*
[37] *Id.*, ¶ 3.
[38] *Id.*
[39] *Id.*, ¶ 3-4.

declined to sell its Counterfeit PRL USA Products to PRL USA's investigator at that time.[40]

TC reinitiated contact with PRL USA's investigator on July 27, 2005, this time offering nearly six thousand pieces of Counterfeit PRL USA Products.[41]  After another thorough background inquiry, TC agreed to send two samples of Counterfeit PRL USA Products to PRL USA's investigator.[42]  PRL USA's investigator received those samples on August 17, 2005, and followed up with TC to hold the remaining Products.[43]  A sales representative of TC informed PRL USA's investigator, however, that all of the Counterfeit PRL USA Products had been sold.[44]

On September 28, 2005, PRL USA's investigator visited TC's showroom at 499 Seventh Avenue, 6th Floor, in New York, New York.[45]  The investigator observed numerous brand name goods for sale, including Timberland, Nautica, Abercrombie and Fitch and Kenneth Cole.[46]  The investigator asked whether TC had any PRL USA branded goods, to which TC responded that they expected some to arrive shortly.  TC asked who had referred PRL USA's investigator, and stated that no one came to the showroom without a recommendation.[47]  TC also repeatedly requested information on the investigator's business so that TC could "check him out" before going any further.[48]

PRL USA has inspected the samples of Defendants' Counterfeit PRL USA Products sent to its investigator and confirmed that such Products are inferior reproductions of the PRL USA Products, complete with labels and hangtags bearing counterfeits of the PRL USA Marks.[49]  The counterfeit men's Oxford tan shirt provided by TC has incorrect hangtags, is missing the requisite care labels, has incorrect

---

[40] *Id.*, ¶ 3.
[41] *See* Declaration of William M. Puerto dated October 20, 2005 ("Puerto Decl."), ¶ 2.
[42] *Id.*
[43] *Id.*, ¶ 2-3.
[44] *Id.*, ¶ 3.
[45] *Id.*, ¶ 4.
[46] *Id.*, ¶ 5.
[47] *Id.*
[48] *Id.*, ¶¶ 4-5.
[49] *See* Elings Decl., Ex. G.

construction and incorrect buttons.[50] The counterfeit men's Twill white shirt provided by TC has incorrect hangtags and incorrect buttons.[51] PRL USA did not manufacture, inspect or package the Counterfeit PRL USA Products, and did not approve the Counterfeit PRL USA Products for sale and/or distribution.[52] PRL USA did not authorize Defendants to manufacture, import, export, distribute, advertise, sell or offer to sell the Counterfeit PRL USA Products.[53] PRL USA has not had the opportunity to control the quality and nature of the Counterfeit PRL USA Products.[54]

### III.    PRL USA IS ENTITLED TO A PRELIMINARY INJUNCTION ENJOINING DEFENDANTS' ACTS OF TRADEMARK COUNTERFEITING, INFRINGEMENT AND DILUTION

Once a violation of the Trademark Act of 1946, 15 U.S.C. § 1051, *et seq.*, as amended (the "Lanham Act") is demonstrated, injunctive relief will readily issue pursuant to Section 34 thereof, 15 U.S.C. § 1116.[55] Courts have granted preliminary relief when a party's proprietary rights are threatened by the sale of potentially inferior versions of its products, bearing marks or ornamentation indicating affiliation with the moving party. Courts base this relief on the trademark holder's "inability to control the nature and quality of the infringer's goods . . . not because the infringer's goods are necessarily inferior."[56]

In order to obtain preliminary injunctive relief, a party must establish: (1) irreparable harm; and (2) either (a) probable success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation with the balance of hardships tipping decidedly in favor of the party requesting preliminary

---

[50] *Id.*

[51] *Id.*

[52] *See* Jetter Decl., ¶ 5.

[53] *Id.*

[54] *Id.*

[55] *See, e.g., Dallas Cowboys Cheerleaders v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 205 (2d Cir. 1979); *Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1013 (5th Cir.), *Cert. denied*, 423 U.S. 868 (1975); *Warner Bros., Inc. v. Gay Toys, Inc*., 658 F.2d 76 (2d Cir. 1981).

[56] *Wesley-Jessen Div. of Schering Corp. v. Bausch & Lomb, Inc.*, 698 F.2d 862 (7th Cir. 1983); *accord, El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392 (2d Cir. 1986), *cert. denied*, 484 U.S. 817; *Polymer Technology Corp. v. Mimran*, 975 F.2d 58, 62 (2d Cir.), *amended reported at* 1992 U.S.App. LEXIS 32204 (2d Cir. 1992), *aff'd* 37 F.3d 74 (2d Cir. 1994) ("actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain").

relief.[57]    This standard applies where a preliminary injunction is sought for an alleged trademark infringement.[58]  As shown below, Plaintiffs meet each of these criteria.

### A.     Defendants' Sale of Their Counterfeit Products Is Irreparably Harming Plaintiffs' Marks and Goodwill Associate Therewith

The Second Circuit has stated that establishing a high probability of confusion as to source or sponsorship almost inevitably establishes irreparable harm to a trademark owner.[59]  This is because the damage to a trademark owner through diminished goodwill, loss of control over reputation or loss of quality control of its product is irreparable, and such irreparable injury is generally presumed sufficient for the grant of a preliminary injunction.[60]  Indeed, this Court has held that with respect to trademark infringement claims, "irreparable harm may be presumed upon a showing that [the] trademark is protectable and that a likelihood of confusion exists as to the ownership or source of goods in question."[61]

As set forth below, Plaintiffs can demonstrate ownership of Plaintiffs' Marks and that a likelihood of confusion will result from Defendants' sale of the Counterfeit Products.[62]  Thus, there is a presumption that Plaintiffs will be irreparably harmed by Defendants' sale of the Counterfeit Products.[63]  Moreover, Defendants' sale of their Counterfeit Products puts inferior products over which Plaintiffs have no control on to the market for purchase by consumers.  Consumers will associate the poor quality of the Counterfeit Products with Plaintiffs, thereby forever damaging Plaintiffs' goodwill and reputation.

---

[57] *Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 122 (2d Cir. 1994); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979); *Firma Melodiya v. ZYX Music GmbH*, 882 F. Supp. 1306, 1311 (S.D.N.Y. 1995).
[58] *Dallas Cowboys Cheerleaders, Inc.*, 604 F.2d at 206-07.
[59] *Omega Importing Corp. v. Petri-Kline Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971); *see also Home Box Office, Inc. v. Showtime/Movie Channel, Inc.*, 832 F.2d 1311 (2d Cir. 1987) (a showing of likelihood of confusion as to source or sponsorship establishes the risk of irreparable harm as well as the requisite likelihood of success on the merits).
[60] *Paco Rabanne Parfums, S.A. v. Norco Enterps.*, 680 F.2d 891, 894 (2d Cir. 1982) ("likelihood of damage to reputation and good will . . . entitles a plaintiff to preliminary relief"); *Hills Bros. Coffee, Inc. v. Hills Supermarkets, Inc.*, 428 F.2d 379, 381 (2d Cir. 1970); *Power Test Petroleum Distributors, Inc. v. Calcu Gas, Inc.*, 754 F.2d 91 (2d Cir. 1985).
[61] *See Firma Melodiya*, 882 F. Supp. at 1311.
[62] *See* Section III.B.
[63] *See Firma Melodiya*, 882 F. Supp. at 1311.

**B.    Plaintiffs Will Likely Prevail on Their Claims for Trademark Counterfeiting and Trademark Infringement**

To prevail on their trademark counterfeiting and infringement claims, Plaintiffs must prove, *inter alia*: (1) they have rights senior to Defendants in Plaintiffs' Marks; and (2) there is a likelihood of confusion between Plaintiffs' Marks as used or intended to be used in the marketplace and Defendants' infringing marks.[64]

**1.    Plaintiffs' Trademarks Are Valid, Protectable Marks.**

Through their pleadings, Plaintiffs have introduced evidence verifying their ownership of federal registrations for Plaintiffs' Marks.[65] These registrations are *prima facie* evidence of the validity of the trademarks that Plaintiffs seek to protect, as well as Plaintiffs' exclusive right to use Plaintiffs' Marks in commerce on or in connection with the goods or services specified in the registration certificates.[66] Furthermore, Plaintiffs have used, and are currently using, Plaintiffs' Marks in commerce on or in connection with their sale of Plaintiffs' Products, and plan to continue such use in the future.[67] Accordingly, Plaintiffs have introduced evidence sufficient to create a likelihood that they will prevail on this first element of their claims for trademark counterfeiting and trademark infringement.

**2.    Consumers Are Likely To Be Confused As To The Source of Defendants' Counterfeit Products**

In the Second Circuit, likelihood of confusion is assessed with reference to the factors enunciated in *Polaroid Corp. v. Polaroid Electronics Corp.*[68] The relevant factors used to analyze whether there is likelihood of confusion are: (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted

---

[64] *See Sands, Taylor & Wood Company*, 978 F.2d 947, 958 (7th Cir. 1992).

[65] *See* Complaint, Exs. A-B.

[66] *See* 15 U.S.C. § 1057(b).

[67] *See* Kaplan Decl. ¶ 5; Jetter Decl., ¶ 6.

[68] *See Polaroid Corp. v. Polaroid Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961), *cert. denied*, 368 U.S. 820 (1961); *see also Banff, Ltd. v Federated Dept. Stores*, 841 F.2d 486, 491 (2d Cir. 1988).

in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market. [69] The applicable *Polaroid* factors favor a finding that Plaintiffs are likely to succeed in showing a likelihood of confusion resulting from Defendants' acts of trademark counterfeiting.

a.    **Defendants' Intent**

If there is a showing that Defendants intended to copy Plaintiffs' Marks, "likelihood of confusion will be presumed as a matter of law." [70] "If the junior user has 'adopted the mark in bad faith, the equitable balance is tipped significantly in favor of a finding of infringement.'" [71] Thus, the issue to be determined by this factor is "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." [72]

Defendants' activities provide ample evidence of intent to trade in counterfeit goods. Defendants sold thousands of pieces of Counterfeit Products in multiple transactions. [73] Defendants are, therefore, hard-pressed to suggest that their sale of these Counterfeit Products was accidental. Moreover, Defendants employ an elaborate screening process for new customers in connection with the sale of branded goods. [74] There is only one reason to engage in this exercise: to ensure that new customers are not in fact investigators or law enforcement officials seeking to identify and prosecute purveyors of counterfeit goods. Finally, Defendants' jackets bear the same unique identifying marker, "Made in China/Fabrique au Bangladesh," as tens of thousands of Counterfeit TAC Products seized in another counterfeiting action in California, and

---

[69] *See Polaroid Corp. v. Polaroid Electronics Corp.*, 287 F.2d at 495.

[70] *The N. Y. State Soc'y Certified Public Accountants v. Eric Louis Assocs., Inc.*, 79 F. Supp. 2d 331, 340 (S.D.N.Y. 1999), citing *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987).

[71] *See Edison Bros. Stores, Inc. v. Cosmair, Inc.*, 651 F. Supp. 1547, 1560 (S.D.N.Y. 1987).

[72] *Kraft General Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123, 131 (S.D.N.Y. 1993). Courts will infer intent to capitalize on the plaintiff's goodwill "[w]hen a company appropriates an identical mark that is well known and has acquired a secondary meaning." *Id.* at 132.

[73] *See* Elings Decl., Exs. A-C; Olsson Decl., ¶ 3-4; Puerto Decl., ¶ 2.

[74] *See* Olsson Decl., ¶¶ 2-4; Puerto Decl., ¶¶ 2, 4-5.

11

Defendants' canceled checks appear in the bank records of the defendants in that California action.[75]

Simply put, Defendants' business is to buy, sell and otherwise traffic in counterfeit goods. Because of Defendants' bad faith intent to copy Plaintiffs' Marks, likelihood of confusion can and should be presumed.

### b.    Strength of Plaintiffs' Marks

This factor examines Plaintiffs' Marks' "ability to identify the source of the goods being sold under [their] aegis."[76] As set forth in Plaintiffs' pleadings and declarations, Plaintiffs' Marks are famous, federally registered marks which have long stood as a symbol for high quality goods.[77] Further, Plaintiffs have used their Marks to identify the source of Plaintiffs' Products for more than thirty-five years, invest heavily in advertising in support of their Marks and have achieved billions of dollars in sales of products sold labeled with Plaintiffs' Marks.[78] Finally, certain of Plaintiffs' Marks have been acknowledged as strong marks within this jurisdiction.[79] Thus, this factor favors Plaintiffs.

### c.    Similarity of the Marks

Courts consider the overall impression created by the trademarks, including the context in which the marks appear, in determining whether the marks are so similar as to be likely to cause confusion.[80] Defendants employ identical counterfeits of Plaintiffs' marks on their Counterfeit Products; thus, this *Polaroid* factor favors Plaintiffs.

---

[75] *See* Elings Decl., ¶¶ 6-7 and Exs. D-E.
[76] *See Brennan's, Inc. v. Brennan's Rest.,* 360 F.3d 125, 130 (2d Cir. 2004).
[77] *See* Complaint ¶¶ 11-12 and 19-20, and Exs. A-B.
[78] *See* Kaplan Decl., ¶¶ 2-3; Jetter Decl., ¶ 2-4.
[79] *See, e.g., Rolex Watch U.S.A., Inc. et al. v. Jones,* 2000 U.S. Dist. LEXIS 15082 at *10 (S.D.N.Y. October 13, 2000) (PRL USA's trademarks are both famous and distinctive).
[80] *See Lexington Management Corp. v. Lexington Capital Partners,* 10 F. Supp. 2d 271, 284 (S.D.N.Y. 1998).

### d.    Proximity of the Products

"[A] plaintiff need not establish that its products…are identical to those offered by the defendant [rather] a plaintiff must show that the parties' products or services 'are sufficiently related that customers are likely to confuse the source of origin.'"[81]  Here, Defendants' Counterfeit Products are precisely the same types of products sold by Plaintiffs:  down and fleece jackets, as sold by TAC, and various men's and women's knit, button-down and polo shirts, as sold by PRL USA.[82]  As a result, this *Polaroid* factor also favors Plaintiffs.

### e.    Bridging the Gap

Bridging the gap involves an analysis of the likelihood that the senior user will enter the junior user's market.[83]  Where the parties sell identical products, "there is no gap to bridge [and] this factor strongly favors plaintiffs."[84]  Because, as set forth above, Defendants' Counterfeit Products are the same type as Plaintiffs' Products, this factor favors Plaintiffs.

### f.    Quality of Defendant's Product

If Defendants' Counterfeit Products are inferior, this *Polaroid* factor weighs in favor of Plaintiffs.[85]  The renown of Plaintiffs' Marks is due largely to Plaintiffs' expert workmanship and rigorous quality control standards.[86]  Plaintiffs' initial inspection of Defendants Counterfeit Products revealed, among other things, poor construction, missing care and security labels and incorrect buttons and hangtags.[87]  More importantly, however, the "actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain." *Polymer Technology Corp. v. Mimran*, 975 F.2d 58, 62 (2d Cir.), *amended reported at* 1992 U.S.App. LEXIS 32204 (2d Cir. 1992), *aff'd* 37 F.3d 74 (2d Cir. 1994).  Because Plaintiffs have no control over the quality of

---

[81] *See Lexington Management Corp.*, 10 F. Supp. 2d at 284-85.
[82] *See* Elings Decl., Exs. A-C, F-G.
[83] *See Lexington Management Corp.*, 10 F. Supp. 2d at 287.
[84] *Consolidated Cigar Corp. v. Monte Cristi de Tabacos*, 58 F. Supp. 2d 188, 198 (S.D.N.Y. 1999).
[85] *See Consolidated Cigar Corp.*, 58 F. Supp. 2d at 199.
[86] *See* Kaplan Decl., ¶¶ 2-3; Jetter Decl., ¶ 2-4.
[87] *See* Elings Decl., Exs. F-G.

Defendants' Counterfeit Products, this factor further supports a finding of likelihood of confusion.

Thus, because the *Polaroid* factors tip heavily in favor of Plaintiffs and against Defendants, Plaintiffs can demonstrate a strong likelihood of confusion, and are likely to prevail on their claims for trademark counterfeiting and infringement.

### C.    Plaintiffs Will Likely Prevail on Their Dilution Claims

Section 1125(c) of the Lanham Act provides that the owner of a famous mark shall be entitled "to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark."[88]  The statute defines "dilution" as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of . . . (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake or deception."[89]  To establish a violation of Section 1125(c), a plaintiff must show that:  (1) its mark is famous; (2) the defendant is making commercial use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish goods and services.[90]

### 1.    Plaintiffs' Marks Are Famous

To establish the first factor of a dilution claim in the Second Circuit, a plaintiff must show that its mark possesses both a "significant degree of inherent distinctiveness" and, to qualify as famous, "a high degree of . . . acquired distinctiveness."[91]  A plaintiff's marks are entitled to a presumption of inherent distinctiveness by virtue of their incontestability.[92]  Here, many of Plaintiffs' Marks are incontestable, entitling Plaintiffs

---

[88] *See* 15 U.S.C.A. § 1125(c)(1).
[89] *Id.*, § 1127.
[90] *Savin Corp. v. Savin Group*, 391 F.3d 439, 448-49 (2d. Cir. 2004).
[91] *Id.* at 449.
[92] *Id.* at 451.

14

to a presumption of inherent distinctiveness.[93]  Moreover, as set forth above, Plaintiffs

have invested millions of dollars in advertising resulting in billions of dollars of sale of

goods under Plaintiffs' Marks over a period of more than thirty-five years.[94]

Accordingly, Plaintiffs' Marks have a high degree of acquired distinctiveness, and, in

turn, Plaintiffs are likely to succeed in showing that Plaintiffs' Marks are famous.

### 2.    Defendants Are Making Commercial Use of Plaintiffs' Marks that Began Well After Plaintiffs' Use

Plaintiffs have set forth substantial evidence above of the second and third factors

on their dilution claim, *i.e.* that Defendants are making commercial use of Plaintiffs'

Marks and that Defendants' activities began well after Plaintiffs began using their Marks

more than thirty-five years ago.[95]  Accordingly, Plaintiffs are likely to succeed on these

elements of their dilution claim.

### 3.    Defendants Counterfeit Activities Dilute Plaintiffs' Marks

Actual dilution may be proven via circumstantial evidence.[96]  Where "a plaintiff

who owns a famous senior mark can show the commercial use of an identical junior

mark, such a showing constitutes circumstantial evidence of the actual-dilution element

of [a dilution] claim."[97]  As set forth above, Defendants' Counterfeit Marks are identical

to Plaintiffs' Marks.  As a result, Defendants' conduct creates the very real likelihood

that, if left unchecked, the value of Plaintiffs' Marks, reputation and goodwill will be

diluted through blurring and/or tarnishment.  Plaintiffs are, therefore, likely to prevail on

their dilution claims.

### D.    There Is a Fair Ground For Litigation, and the Balance of Hardships Tips Decidedly in Plaintiffs' Favor

Plaintiffs strongly believe that they have established beyond question the required

likelihood of success as to Defendants' liability for trademark counterfeiting, trademark

infringement and trademark dilution under the Lanham Act.  However, should this Court

---

[93] *See* Complaint Exs. A-B.
[94] *See* Kaplan Decl., ¶¶ 2-3; Jetter Decl., ¶ 2-4.
[95] *See* Section II.A-C; *see also* Section III.A-B.
[96] *See Savin Corp. v. Savin Group*, 391 F.3d at 452.
[97] *Id.* at 453.

not find such likelihood of success, Plaintiffs respectfully submit that they have at least

raised serious questions going to the merits of their claims, and that the balance of

hardships tips decidedly in Plaintiffs favor.

For the same reasons that Plaintiffs are likely to prevail on their claims, as

discussed above, Plaintiffs have raised serious questions for which there is a fair ground

for litigation.[98] This Court must then balance Plaintiffs' harm from the wrongful denial

of a preliminary injunction against any harm Defendants may suffer from granting an

injunction that would not be cured by prevailing on the merits and recovering on

Plaintiffs' bond. As set forth above, the harm to Plaintiffs is irreparable.[99] The continued

unauthorized use of Plaintiffs' Marks further threatens Plaintiffs' reputation because

Plaintiffs will lose control over the quality and appearance of their products, which will

ultimately destroy the value of Plaintiffs' Marks as a designation of source. The harm to

Defendants, on the other hand, is at worst monetary. Moreover, Defendants have no

legitimate interest in selling their Counterfeit Products or otherwise using Plaintiffs'

Marks without Plaintiffs' permission. Indeed, given "the probable outcome of this

action, this is a loss which [defendants] may justifiably be called upon to bear."[100]

After balancing Defendants' potential monetary harm against (a) the irreparable

harm to Plaintiffs' goodwill and reputation built through years of promoting and selling

high quality products and (b) the disastrous long-term effects of unfettered infringement

and counterfeiting on Plaintiffs, the harm to Plaintiffs outweighs any potential harm to

Defendants.[101]

### E.    This Court May Issue an *Ex Parte* Seizure Order

Once a violation of the Lanham Act is demonstrated, the issuance of an *ex parte*

seizure order is appropriate upon a showing that: (i) the person obtaining the order will

---

[98] *See* Section III.B-C, *supra.*

[99] *See* Section III.A, *supra.*

[100] *Corning Glass Works v. Jeanette Glass Co.*, 308 F. Supp. 1321, 1328 (S.D.N.Y.), *aff'd*, 432 F.2d 784 (2d Cir. 1970).

[101] *See, e.g., Lesportsac, Inc. v. K-Mart Corp.*, 754 F.2d 71, 79 (2d Cir. 1985) ("the potential damage to Lesportsac's mark and goodwill in the absence of a preliminary injunction outweighs the short-term economic harm that K-Mart may suffer"), *abrogated on other grounds by Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992).

provide adequate security; (ii) an order other than an *ex parte* seizure order is not adequate to achieve the purposes of 15 U.S.C. § 1114; (iii) the applicant has not publicized the requested seizure; (iv) the applicant is likely to succeed in showing the defendant used a counterfeit mark; (v) an immediate and irreparable injury will occur if such seizure is not ordered; (vi) the materials to be seized will be located at the place identified in the application; (vii) the harm to the applicant in denying the application outweighs the harm to the legitimate interests of the person against whom seizure would be ordered; and (viii) if the applicant were to proceed on notice to the defendant, the defendant or persons acting in concert with defendant would destroy, move, hide, or otherwise make such matter inaccessible to the court.[102]

Where, as here, each of the statutory elements are satisfied, it is an abuse of discretion to deny an *ex parte* seizure order.[103]  In granting plaintiff an *ex parte* seizure order, one district court stated that notice of the restraining order without seizure:

> would be likely to result in the disappearance of the counterfeit
> FILA goods and related records, or the "dumping" or transfer of
> the counterfeit goods to unknown third parties jeopardizing
> plaintiff's ability to prevent irreparable injury, to stop distribution
> of counterfeit FILA products and to determine the source and
> extent of the defendants' dealings.[104]

Perceiving the unfortunate reality of this situation, the covert nature of bootlegging activities and the vital need to establish an economic disincentive for trademark counterfeiting, district courts in this Circuit and others now regularly issue *ex parte* seizure orders.[105]

---

[102] *See* 15 U.S.C. § 1116(d)(4)(B).

[103] *Vuitton v. White*, 945 F.2d 569, 575-76 (3d Cir. 1991) (discussing the legislative history of §1116(d) that "ex parte seizures ... [are] a necessary tool to thwart the bad faith efforts of fly by night defendants to evade the jurisdiction of the court"); *see also Lorillard Tobacco Company v. Bisan Food Corp.* 2004 WL 1682766 (3rd Cir. July 28, 2004).

[104]  *Fimab-Finanziaria Maglificio,. v. Ketchen*, 548 F. Supp. 248, 250 (S.D. Fla. 1982).

[105]  *See, e.g., North Face Apparel Corp. v. Reliance Department Stores, et al.*, S.D.N.Y. 03 CV 9596; *Cartier International B.V., et al. v. Sam Liu, et al.*, S.D.N.Y. 02 CV 7926 (TPG); *Fila U.S.A., Inc. v. Top Luxor Trading*, C.D. Cal., CV98-5187*(RNB); Reebok Int'l Ltd. v. Byron McLaugh-lin, et al.*, S.D. Cal., 89 Civ. 1739-T; *Reebok Int'l Ltd. v. Marnatech Enterprises, Inc.*, C. D Cal., 89-1361 GT; *Fila USA, Inc. v. Eidai International, et al.*, Dist. of Hawaii, 93-0083 DAE; *Reebok Int'l Ltd. v. Fairgulf Int'l Shipping and Trading, U.S.A., Inc*, W.D. Texas, 93 Civ. 391; *The Keds Corp. v. Pete Costello et al.*, M.D. Fla., 93 Civ. 371 (ORL) 22; *Reebok Int'l v. Stanley Zitron, et al.* W.D. Tenn. 92 Civ-2644 (CHA).

17

Here, Plaintiffs meet each of the criteria for issuance of a seizure order required by the Lanham Act. Plaintiffs have indicated the willingness and ability to provide a bond to the Court in conjunction with the *ex parte* relief that they seek.[106] Plaintiffs have not publicized the requested seizure.[107] Plaintiffs will succeed in showing that Defendants have sold counterfeits of Plaintiffs' Products, and irreparable harm will flow therefrom.[108] Plaintiffs have submitted evidence showing that the materials to be seized will be located at Defendants business locations in New York.[109] Finally, given the nature of Defendants' counterfeiting operations and as set forth in detail above and below, an order other than an *ex parte* seizure order is not adequate to achieve the purposes of 15 U.S.C. § 1114; the harm to the Plaintiffs' Marks and goodwill in denying the application outweighs the harm to Defendants' interests in continuing to sell Counterfeit Products; and if Plaintiffs' were to proceed on notice to Defendants, Defendants' or persons acting in concert therewith would likely destroy, move, hide, or otherwise make such matter inaccessible to the court.[110]

**F.      Plaintiffs Are Entitled to an Order Restraining Defendants' Transfer of Assets**

Plaintiffs will ultimately be entitled to an equitable accounting of Defendants' profits from sales of Defendants' Counterfeit Products.[111] Multiple circuit courts have made clear that a district court has the inherent authority pursuant to the Lanham Act to issue an order restraining a defendant's assets so that a plaintiff's right to an equitable accounting is not later rendered meaningless.[112] This is consistent with long standing practices in the Second Circuit, which provide that "the framing of an injunctive decree responsive to the particular facts in a trademark infringement and unfair competition suit

---

[106] *See* Plaintiffs' [Proposed] Order, filed herewith.

[107] *See* Kaplan Decl., ¶ 6; Jetter Decl., ¶ 7;

[108] *See, supra,* Sections III.A-C.

[109] *See* Puerto Decl., ¶¶ 4, 6-7; Elings Decl., Exs. A-C.

[110] *See, supra,* Section III.A-D and *infra* Section III.F.

[111] *See* 15 U.S.C. §1117; *see also International Star Class Yacht Racing Ass'n v. Tommy Hilfiger USA, Inc.,* 80 F.3d 749 (2d Cir. 1996).

[112] *See, e.g., Levi Strauss & Co. v. Sunrise Int'l Trading,* 51 F.3d 982 (11th Cir. 1995); *Reebok Int'l Ltd. v. Marnatech Enter.,* 737 F.Supp. 1515 (S.D. Cal. 1989), *aff'd,* 970 F.2d 552 (9th Cir. 1992).

is ordinarily within the domain of the trial court," and that "every means of preventing continuance of deceptive practices is proper."[113]

In *Reebok v. Marnatech*, the Ninth Circuit affirmed the District Court's grant of an asset restraint, stating that "because the Lanham Act authorizes the District Court to grant Reebok an accounting of Betech's profits as a form of final equitable relief, the District Court has the inherent power to freeze Betech's assets in order to ensure the availability of that final relief."[114] In determining whether to issue an order restraining a defendant's assets, the Court of Appeals stated a plaintiff must show: (1) a likelihood of success on the merits; (2) immediate and irreparable harm as a result of defendants' counterfeiting activities; and (3) that defendants might hide their illegal ill-gotten funds if their assets were not frozen.[115]

As set forth above, Plaintiffs have shown that they are likely to succeed on the merits of their claims, and that they will suffer irreparable injury from Defendants' sale of Counterfeit Products. Defendants are also likely to hide their assets. Defendants trade in counterfeit goods; thus, unlike a legitimate business that has roots in its local community, Defendants have no reason to stay put once their counterfeiting scheme is uncovered. In light of the fact that Defendants trade in counterfeit goods, it is reasonable to believe that Defendants will move quickly to remove monies subject to an equitable accounting to locations and accounts which neither Plaintiffs nor this Court will ever discover. Thus, an asset restraining order limiting the transfer of Defendants' assets is critical to maintain the status quo and preserve Plaintiffs' right to an equitable accounting.

---

[113] *Levitt Corp. v. Levitt*, 593 F.2d 463, 469 at fn. 10 (2d Cir. 1979) (citations omitted); *American Safety Table Co., Inc. v. Schreiber*, 287 F.2d 417, 419-20 (2d Cir. 1961).

[114] *Reebok v. Marnatech, supra* 970 F. 2d at 559; s*ee also, Republic of Philippines v. Marcos*, 862 F.2d 1355, 1364 (9th Cir. 1988), *cert. denied*, 490 U.S. 1035 (1989) ("[a] court has the power to issue a preliminary injunction in order to prevent a defendant from dissipating assets in order to preserve the possibility of equitable remedies"); *see also Mason Tenders Dist. Council Pension Fund v. Messera*, 1997 WL 223077 (S.D.N.Y. May 7, 1997) (acknowledging that "[a]lmost all the Circuit Courts [including the Second Circuit] have held that Rule 65 is available to freeze assets *pendente lite* under some set of circumstances).

[115] Reebok *v. Marnatech*, 737 F. Supp. at 1524, 1527; *see Mason Tenders Dist. Council Pension Fund*, 1997 WL 223077 at *8 (granting injunction securing assets where showing irreparable harm and either likelihood of success on merits or serious questions on the merits and balance of hardships tipping toward movant).

### G.    Plaintiffs Are Entitled To Expedited Discovery

District courts have broad power to permit expedited discovery allowing Plaintiffs to take early depositions and to require early document production in appropriate cases.[116] Expedited discovery may be granted when the party seeking it demonstrates: (1) irreparable injury; (2) some likelihood of success on the merits; (3) some connection between expedited discovery and the avoidance of irreparable injury; and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that defendant will suffer if expedited relief is granted.[117]

Plaintiffs are being irreparably harmed by Defendants' manufacture, importation, offering for sale and sale of the Counterfeit Products. Plaintiffs, therefore, need to ascertain Defendants' sources of the Counterfeit Products, and any pending sales, shipments or shipments en route without delay. Only armed with that information can Plaintiffs ensure the complete cessation of the counterfeiting of Plaintiff's Marks and Plaintiffs' Products by Defendants and Defendants' associates.

The discovery requested on a expedited basis in Plaintiffs' proposed temporary restraining order has been precisely defined and carefully limited to include only what is essential for the preliminary injunction. Discovery of Defendants' import, distribution and sale of the Counterfeit Products and unauthorized use of Plaintiffs' Marks will permit Plaintiffs to gain a full and accurate picture of Defendants' infringing activities and ensure that these activities will be contained. Specifically, Plaintiffs need to obtain copies of shipping, import and export documents, including bills of lading, purchase orders, and certificates of origin to discover details regarding (1) pending shipments and (2) the location of Counterfeit Products which are sold by Defendants and/or have already been exported and distributed throughout the United States and the world. Furthermore, the proposed temporary restraining order includes a protective order regarding any documents seized or copied by Plaintiffs.

---

[116] *See* Fed. R. Civ. P. 30(b) & 34(b).
[117] *See Advanced Portfolio Technologies, Inc. v. Advanced Portfolio Technologies Ltd.*, No. 94 Civ. 5620 (JFK), 1994 WL 719696, at *3 (S.D.N.Y. Dec. 28, 1994); *Twentieth Century Fox Film Corp. v. Mow Trading Corp.*, 749 F. Supp. 473, 475 (S.D.N.Y. 1990).

20

Plaintiffs are unaware of any reason that Defendants cannot comply with these requests without undue burden. More important, as stated in the supporting declarations and *supra*, Defendants have engaged in numerous deceptive practices that indicate Plaintiffs may lose the opportunity for meaningful discovery about the requested relief. Accordingly, the request for expedited discovery should be granted.

## IV.    **CONCLUSION**

Based on the foregoing, Plaintiffs respectfully urge this Court to grant an order temporarily restraining Defendants from selling their Counterfeit Products or any unauthorized use of Plaintiffs' Marks, an order of seizure, an order to show cause for preliminary injunction and an order for expedited discovery.

Dated:  October 24, 2005                    Respectfully submitted,

                                            **GREENBERG TRAURIG LLP**

                                            By: _____
                                            G. Roxanne Elings (GE 8321)
                                            David Saenz (DS 1976)
                                            MetLife Building
                                            200 Park Avenue, 34th Floor
                                            New York, NY 10166
                                            Telephone: (212) 801-9200
                                            Facsimile: (212) 801-6400

                                            Attorneys for Plaintiffs The North Face
                                            Apparel Corp., PRL USA Holdings, Inc. and
                                            Polo Ralph Lauren Corporation